# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Andrew Pampu, Appellant-Respondent,

v.

Erin Wingo, David Wingo, and Colin J. Gahagan, Respondents-Appellants.

Appellate Case No. 2022-001332

———————

Appeal From Pickens County
Perry H. Gravely, Circuit Court Judge

———————

Opinion No. 6112
Heard March 13, 2025 – Filed June 11, 2025

———————

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

———————

Kimberly C. Lau and James E. Figliozzi, both of Offit Kurman, P.A., of New York, New York; Sarah D. Baum, of Whelan Mellen & Norris, LLC, and Michael A. Timbes, of Thurmond Kirchner & Timbes, P.A., both of Charleston; all for Appellant-Respondent.

C. Mitchell Brown, Jonathan M. Knicely, and Madison Caroline Guyton, all of Nelson Mullins Riley & Scarborough LLP, and John M. Grantland, of Murphy & Grantland, P.A., all of Columbia, for Respondents-Appellants Erin Wingo and David Wingo.

David L. Moore, Jr., of Turner Padgett Graham & Laney, P.A., of Greenville, for Respondent-Appellant Colin J. Gahagan.

---

**GEATHERS, J.:** In this defamation action, Appellant-Respondent Andrew Pampu seeks review of the circuit court's judgment notwithstanding the verdict (JNOV) on his civil conspiracy claim. Pampu argues there was sufficient evidence of the elements of civil conspiracy to support the jury's verdict for him. Respondents-Appellants challenge the circuit court's denial of their directed verdict and JNOV motions on Pampu's defamation claim. They argue that collateral estoppel precludes Pampu from establishing the falsity of their alleged defamatory statements because an administrative hearing board for Clemson University's Office of Community and Ethical Standards (OCES) found that Pampu had sex with Respondent-Appellant Erin Wingo when she was intoxicated and did not have the capacity to consent. We affirm in part, reverse in part, and remand for the entry of a JNOV on Pampu's defamation claim.[1]

## FACTS/PROCEDURAL HISTORY

The genesis of this troubling litigation is a night of drunkenness at a college fraternity party on October 24, 2015. Prior to attending this party, Ms. Wingo, a 5'2" Clemson freshman weighing between 114 and 118 pounds, consumed approximately nine 1.5-ounce shots of alcohol at a friend's dorm room. This occurred over the course of approximately one hour. Ms. Wingo then went to the party on the premises of the Phi Delta Theta fraternity, a/k/a "the Compound,"[2] at approximately 10:45 p.m. Once there, she found Respondent-Appellant Colin J. Gahagan, with whom she was having a physically intimate relationship, and took

---

[1] We decline to address Respondents-Appellants' remaining issues because our remand for the entry of a JNOV on the defamation claim and affirmance of the JNOV on the civil conspiracy claim are dispositive. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing that an appellate court need not address remaining issues when resolution of a prior issue is dispositive).

[2] The Compound comprised three houses and a courtyard. It is located off-campus in downtown Clemson.

two "pulls" from a water bottle filled with vodka.[3]  She became upset over something Gahagan said, parted ways with him, and at some point, went to look for Pampu, with whom she had "made out" several weeks before.  Both Gahagan and Pampu were also freshmen and were rushing the Phi Delta Theta fraternity.  Ms. Wingo testified that as she was asking another fraternity "pledge brother," Ben Zboray, to help her find Pampu, she was "feeling the effects of the alcohol substantially."  She also testified that she remembered only some of what occurred that night, "like individual snapshots."

According to Pampu's testimony, Ms. Wingo found him in the courtyard and propositioned him with oral sex.  Pampu observed that she was drunk.  The two then went behind another house on the property, made out, then walked down a path for approximately one-quarter to one-half of a mile, leaving the property.  When they arrived at a location between a wooden fence and a shed, they both took a sip from Ms. Wingo's bottle filled with vodka.  Pampu testified that they then made out and ultimately engaged in sexual intercourse at Ms. Wingo's suggestion.  Afterward, according to Pampu, they were quiet for a while, then had a conversation about Gahagan, re-dressed themselves, and walked back to the Compound.

Pampu also testified that on the way back to the Compound, Ms. Wingo was "extremely emotional" about having "been blown off by [Gahagan] that night" and he realized that she was "on the bad end of drunk" and was stumbling.  When they arrived at the Compound's main house, Ms. Wingo sat on the front steps, and Pampu had a private conversation with Zboray to explain why Ms. Wingo was upset.  Pampu told Zboray that Ms. Wingo was "looking for [Gahagan]" and that she and Pampu had "just hook[ed] up."  Zboray offered to get a ride for Ms. Wingo and a friend of hers, Rachel Corbin, to take them back to their respective dormitories, and Pampu went back to the party.  Around the same time, Corbin and another friend, Olivia Pescatore, noticed that Ms. Wingo was crying "hysterically" and repeatedly asking why Gahagan did not love her.  Pescatore observed that Ms. Wingo was intoxicated to the point of being incapacitated.

Around this time, Ms. Wingo began sending text messages, some of which were unintelligible, to Gahagan.  Ms. Wingo believed that she had "messed up the plan" to "go home with" Gahagan that night.  She eventually got into a car with Zboray, Corbin, Pescatore, and Hayley Sinclair.  On the way back to, and after

---

[3] Both Gahagan and Ms. Wingo denied that they were "dating" each other.  Their physical relationship was not "exclusive," but Gahagan considered Ms. Wingo to be his "best friend."

arriving at, her dormitory, Ms. Wingo continued crying and talking about Gahagan. She vomited several times after arriving at her dormitory, and the vomiting continued throughout the next day (Sunday, October 25).

At approximately 3:00 a.m. on Sunday, one of Pampu's pledge brothers, Jonathan Stoddart, began sending a series of text messages to Pampu. One of the messages stated, "I hope you killed it on your birthday," meaning "had a good time." Pampu responded, in part, "I ****ed a chick by the garbage thing behind [C]hipotle[,] so I think I definitely did with [that] alone." Without Pampu's permission, Stoddart took a screen shot of Pampu's response and shared it with everyone in their pledge class in a group text. Pampu did not react to this.

According to Ms. Wingo, when she first woke up that morning, she felt confused about why she and Gahagan "had gotten into a fight" and she did not remember most of what had happened the night before, only that she was "feeling like [her] world had changed" and she had a "pit in [her] stomach." At 7:58 a.m., Ms. Wingo began sending a series of text messages to Gahagan over the next few hours, including one that stated, "I cried over you last night. [A]ll night." She also sent a text message to Pampu at 10:04 a.m., stating, "do not tell [Gahagan] what happened." She explained that she had "a gut feeling that something bad happened" and "whatever it was, [she] was worried it was going to hurt [Gahagan]."

She went back to sleep, and after she woke again, her friend Jami Hafner visited her and observed that she was upset over Gahagan and Pampu. Ms. Wingo told Hafner, "I think I had sex with [Pampu]." Ms. Wingo testified that she was not sure about that until late Sunday afternoon, when Gahagan showed her Pampu's text message to Stoddart. At that time, Ms. Wingo was not completely forthcoming with Gahagan, as she told him that she remembered seeing Pampu at the party and she did not remember anything else until she left the party with her friends. Gahagan stated something to the effect of "If you don't remember, it's rape." Ms. Wingo testified that she did not tell Gahagan about the "other things" she remembered because she was embarrassed, she was not ready to tell him, and she "was worried."

At approximately 5:10 p.m., Ms. Wingo sent a text message to Hafner stating that Gahagan knew about Pampu. She also participated in a group text between herself, Pescatore, and Sinclair, in which she stated, "I hooked up with [Pampu] and had sex apparently and I don't remember it," and sent a similar message to other close friends. Closer to midnight, Ms. Wingo sent the following text message to Gahagan:

> I need you to tell me it's going to be okay because I'm [lying] here in bed and all I can think about is last night and the crying and how I feel violated because [Pampu] should have known better and I shouldn't get to be upset because I let it happen but I am mad because I screwed up with you . . . and I know we aren't a thing and stuff but you're my best friend and I need to know it[']s going to be okay because right now I feel like I don't deserve it to be okay.

(reformatted).

On the following Monday night, Ms. Wingo's roommate reported Pampu's sexual encounter with Ms. Wingo to a resident assistant, who in turn filed a report with Clemson officials the next day. The report included a statement that Ms. Wingo did not want to report the incident. On the same day that the report was filed, Clemson's "Deputy Title IX Coordinator"[4] with OCES, Alesia Smith, asked Ms. Wingo to meet with her. Ms. Wingo recalled that she cried throughout the entire meeting and did not say "a single word." She asked a friend, Ashley Hodge, to pick her up from the meeting and help her "get home." Ms. Wingo apprised Hodge of the reason for the meeting, using the word "rape" for the first time. She later told family members and friends that she had been raped. On Tuesday night, Gahagan sent a text to Ms. Wingo stating that he heard Pampu's "side of the story" and it made Gahagan "feel like [Pampu was] not a criminal[, b]ut he still did make an extreme unforgivable mistake."

Approximately two weeks later, Ms. Wingo filed a formal complaint with OCES, and Smith sent a letter to Pampu advising him that she would be investigating the complaint according to the procedures in Clemson's Student Handbook. Ultimately, an administrative hearing board found that Ms. Wingo was incapacitated and unable to give consent to sexual intercourse and that Pampu "should have reasonably known." On February 29, 2016, the board suspended Pampu for approximately five months, and on appeal, Clemson's President added an additional

---

[4] Referencing Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 to 1689. Section 1681(a) provides, with certain exceptions, that no "person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

year to the suspension. Pampu did not attempt to appeal the decision under the Administrative Procedures Act.

On June 15, 2016, Pampu filed an action in federal court naming as defendants Clemson University, Clemson University Board of Trustees, and several of Clemson's individual employees. He asserted claims for violation of Title IX of the Education Amendments of 1972, violation of due process (Fourteenth Amendment), breach of contract, breach of the covenant of good faith and fair dealing, negligence, promissory estoppel, and declaratory judgment. Ultimately, the parties settled the case, and this settlement kept the February 29, 2016 decision of Clemson's administrative hearing board in place. Accordingly, on March 27, 2018, the United States District Court for the District of South Carolina, Anderson Division, dismissed the action. *See Doe v. Clemson Univ.*, No. 8:16-CV-1957, 2019 WL 1383822 (D.S.C. Mar. 27, 2019) (unpublished).[5]

Meanwhile, on June 15, 2017, Pampu filed the present action, asserting claims for, *inter alia*, defamation and civil conspiracy. Respondents-Appellants filed summary judgment motions asserting, *inter alia*, that Pampu was collaterally estopped by the board's findings from asserting that Ms. Wingo consented to intercourse. However, the circuit court denied the motions and conducted a jury trial on March 21-25, 2022. Respondents-Appellants raised collateral estoppel again when arguing their directed verdict motions immediately after the conclusion of their case. Nonetheless, the circuit court sent Pampu's claims to the jury. The trial concluded with a jury verdict for Mr. Wingo on the civil conspiracy claim and the following verdicts for Pampu: Civil Conspiracy, as to Ms. Wingo, $2,000,000 in actual damages; as to Gahagan, $1,000,000 in actual damages; Defamation, as to Ms. Wingo, $700,000 in actual damages and $450,000 in punitive damages; as to Mr. Wingo, $230,000 in actual damages and no punitive damages; as to Gahagan,

---

[5] The District Court dismissed the case without prejudice to seek, within sixty days, to reopen the case if settlement had not been consummated "or, alternatively, to enforce the settlement agreement." *Id.* On March 27, 2019, the District Court filed its opinion and order granting Clemson's motion to enforce the settlement agreement. *Id.* The parties executed the final version of the settlement agreement on July 1, 2019. On March 19, 2021, Pampu and his parents filed a legal malpractice action against the attorneys who represented him in the federal action and initially represented him before the circuit court in the present action. *See Pampu v. Clawson Fargnoli*, *Civil Action No.* 2021-CP-10-01343. Pampu's appeal of the circuit court's dismissal of the malpractice action is now pending before this court. *See Pampu v. Clawson Fargnoli*, *Appellate Case No.* 2023-001779.

$700,000 in actual damages and $220,000 in punitive damages. The Wingos and Gahagan then filed separate motions for a JNOV, new trial absolute, or new trial *nisi*,[6] raising the issue of collateral estoppel once more. The circuit court granted Gahagan's and Ms. Wingo's motions for a JNOV as to Pampu's civil conspiracy claim but denied all remaining post-trial motions. The circuit court also denied Mr. Wingo's motion to reconsider. This appeal followed.

## LAW/ANALYSIS

### I.  JNOV/Civil Conspiracy

Pampu argues that the circuit court erred by granting a JNOV on his civil conspiracy claim because there was sufficient evidence to support each of the elements of this claim and the circuit court correctly denied Respondents-Appellants' directed verdict motions on this issue at trial. We disagree.

"In considering a JNOV, the [circuit court] is concerned with the existence of evidence, not its weight." *Curcio v. Caterpillar, Inc.*, 355 S.C. 316, 320, 585 S.E.2d 272, 274 (2003). "The jury's verdict must be upheld unless no evidence reasonably supports the jury's findings." *Id.* "When ruling on a JNOV motion, the [circuit] court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party." *Williams Carpet Contractors, Inc. v. Skelly*, 400 S.C. 320, 325, 734 S.E.2d 177, 180 (Ct. App. 2012). "This court must follow the same standard." *Id.* "If more than one reasonable inference can be drawn or if the inferences to be drawn from the evidence are in doubt, the case should be submitted to the jury." *Id.* (quoting *Chaney v. Burgess*, 246 S.C. 261, 266, 143 S.E.2d 521, 523 (1965)). However, "[i]f only one reasonable inference can be drawn from the evidence, the motion must be granted." *Brady Dev. Co. v. Town of Hilton Head Island*, 312 S.C. 73, 78, 439 S.E.2d 266, 269 (1993).

To successfully assert a civil conspiracy claim, the plaintiff must show "(1) the combination or agreement of two or more persons, (2) to commit an unlawful act or a lawful act by unlawful means, (3) together with the commission of an overt act in furtherance of the agreement, and (4) damages proximately resulting to the plaintiff." *Paradis v. Charleston Cnty. Sch. Dist.*, 433 S.C. 562, 574, 861 S.E.2d 774, 780 (2021). "Since civil conspiracy is an intentional tort, an intent to harm, which has also been discussed in our conspiracy law, remains an inherent part of the analysis." *Id.* at 574 n.9, 861 S.E.2d at 780 n.9. "Conspiracy may be inferred from

---

[6] Gahagan did not seek a new trial *nisi*.

the nature of the acts committed, the relationship of the parties, the interests of the alleged conspirators, and other relevant circumstances." *Moore v. Weinberg*, 373 S.C. 209, 228, 644 S.E.2d 740, 750 (Ct. App. 2007), *aff'd*, 383 S.C. 583, 681 S.E.2d 875 (2009).

Pampu states that his civil conspiracy claim is based on Gahagan's and Ms. Wingo's "concerted effort to have Pampu removed from Clemson." Pampu also states that Gahagan and Ms. Wingo "utilized the Clemson disciplinary process to achieve that goal" and "[i]t is clear that the false statements [Ms.] Wingo and Gahagan provided to Clemson during the disciplinary process . . . led to Pampu's removal from Clemson." However, in its order granting a JNOV on this claim, the circuit court found, *inter alia*, that there was no evidence of any unlawful act, any lawful act by unlawful means, or resulting damages.

Pampu maintains that the "unlawful act" committed by Gahagan and Ms. Wingo was the tortious interference with a contract. He asserts that he had a contract with Clemson in which he would make tuition payments and comply with Clemson's policies in exchange for his continued enrollment as a student, and Gahagan and Ms. Wingo caused Clemson to breach that contract by removing him from enrollment.

"The elements of a cause of action for tortious interference with contract are: (1) existence of a valid contract; (2) the wrongdoer's knowledge thereof; (3) [the wrongdoer's] intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages." *Vortex Sports & Ent., Inc. v. Ware*, 378 S.C. 197, 205, 662 S.E.2d 444, 449 (Ct. App. 2008) (quoting *Camp v. Springs Mortg. Corp.*, 310 S.C. 514, 517, 426 S.E.2d 304, 305 (1993)). We agree that Pampu's status as a student at Clemson was in the nature of a contractual relationship. *See Carter v. Univ. of S.C.*, 360 S.C. 428, 432 n.4, 602 S.E.2d 59, 61 n.4 (Ct. App. 2004) ("It is commonly held that a contract exists between a university and its students.").

Pampu's settlement of his lawsuit against Clemson, which included a breach of contract claim, precluded him from asserting at trial that Clemson breached its contract with Pampu. *See infra* (discussion of collateral estoppel); Restatement (Second) of Judgments § 27 cmt. e (Am. L. Inst. 1982) (stating that a consent judgment may be conclusive with respect to one or more issues if the parties have entered an agreement manifesting such an intention). Even if Pampu was not so

precluded, there are no reasonable inferences that can be drawn from the evidence presented to the jury of a breach.[7]

First, section 59-105-40 of the South Carolina Code (2020), which is part of the South Carolina Campus Sexual Assault Information Act, contemplates the responsibility of Clemson's OCES to conduct disciplinary proceedings when it receives a complaint of sexual assault.[8] Subsection (A) requires "each institution of higher learning" to "establish *and implement*" a written sexual assault policy, and subsection (B)(4) requires that the policy address

> procedures for institutional disciplinary action in cases of alleged sexual assault, including a clear statement that both the accuser and the accused:
>
> (i) have the same opportunities to have support persons or legal counsel, if the institution's policy allows the presence of outside legal counsel, present during an institutional disciplinary proceeding; and
>
> (ii) must be informed of the outcome of an institutional disciplinary proceeding brought alleging a sexual assault.

§ 59-105-40 (emphasis added). Therefore, Clemson's imposition of a sanction against Pampu for violating its sexual assault policy can hardly be characterized as a breach of contract, especially given Pampu's contractual duty to comply with Clemson's policies. We note that Pampu does not cite any authority to the contrary.

---

[7] Further, Pampu's argument that Clemson's suspension of Pampu constituted a breach of contract does not appear in his initial brief; it is only in his reply brief. Therefore, he did not properly present his theory of tortious interference with a contract to this court. *See Glasscock, Inc. v. U.S. Fid. & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 692 (Ct. App. 2001) ("[A]n argument made in a reply brief cannot present an issue to the appellate court if it was not addressed in the initial brief."). Nonetheless, we will address the merits out of an abundance of caution.

[8] Although the name of the Act includes the term "campus" in it, section 59-105-40 also covers sexual assaults that occur off-campus if both the accused and the accuser are students of the institution. *See* § 59-105-40(D) ("[T]he institution's law enforcement personnel, security personnel, and counseling center must make the written policy available to a student who reports being a victim of a sexual assault involving another student *or* occurring on campus." (emphasis added)).

Therefore, he has abandoned this argument. *See Glasscock*, 348 S.C. at 81, 557 S.E.2d at 691 ("[S]hort, conclusory statements made without supporting authority are deemed abandoned on appeal and therefore not presented for review.").

To the extent that Pampu argues an impropriety in the Title IX proceedings constituted a breach, the circuit court excluded the evidence pertaining to these proceedings from the jury's consideration.[9] Therefore, there was no evidence before the jury showing that these proceedings were not lawfully initiated or conducted. Pampu makes the conclusory statement that Clemson "unilaterally failed to perform its portion of the contract it had with Pampu due to the false statements that [Ms.] Wingo and Gahagan provided during the disciplinary process." However, Pampu is barred from asserting that Ms. Wingo and Gahagan made false statements concerning her lack of consent because Pampu not only failed to appeal the decision of Clemson's President pursuant to the Administrative Procedures Act (APA), *see infra* (discussion of collateral estoppel), but also settled his federal lawsuit against Clemson, which specifically left the board's findings in place.[10]

Further, he does not assert that any Clemson employee knowingly accepted or acted on any false evidence. Neither does he cite any authority allowing him to second-guess the administrative hearing board's assessment of the credibility of the evidence before it. Therefore, he has abandoned this argument. *See Glasscock*, 348 S.C. at 81, 557 S.E.2d at 691 ("[S]hort, conclusory statements made without supporting authority are deemed abandoned on appeal and therefore not presented for review."). Because Pampu failed to show a breach of contract on Clemson's part, there can be no tortious interference with a contract with which to establish the "unlawful act" element of civil conspiracy.

As to the civil conspiracy element "damages proximately resulting to the plaintiff," Pampu broke the chain of causation by failing to appeal the decision of Clemson's President upholding his suspension and settling his federal lawsuit against Clemson, precluding any possible reversal of the suspension. Moreover, the testimony of Pampu's expert witness that but for having to self-report his suspension on his dental school applications, Pampu would have not only been accepted into dental school *but also* completed dental school and completed the additional training required to specialize in orthodontics was pure speculation and does not qualify as even minimally probative evidence to support the jury's verdict.

---

[9] We express no opinion on the propriety of excluding this evidence.

[10] We express no opinion on the preclusive effect of Pampu's failure to appeal the President's decision pursuant to the APA on the issues in his federal lawsuit.

Finally, Pampu argues that it is "unclear how a circuit court could possibly deny a motion for a directed verdict and then grant a JNOV motion on the same issue without improperly deciding credibility issues [or] resolving evidentiary conflicts." In support of this argument, Pampu cites this court's opinion in *Garrison v. Target Corp.*, 429 S.C. 324, 348–49, 838 S.E.2d 18, 31 (Ct. App. 2020) (*Garrison I*), *aff'd in part as modified, rev'd in part*, 435 S.C. 566, 869 S.E.2d 797 (2022) (*Garrison II*). In *Garrison I*, this court reversed the circuit court's granting of a JNOV on the jury's punitive damages award, and our supreme court affirmed this part of the opinion. *Id.* at 349, 838 S.E.2d at 31; *Garrison II*, 435 S.C. at 585, 869 S.E.2d at 808.

Specifically, this court addressed the plaintiffs' concern that the circuit court "conflated evidentiary sufficiency with constitutional excessiveness" and "failed to articulate the standard for evaluating a motion for a JNOV as to the award of punitive damages" because the court was primarily concerned with the amount of the jury's verdict. *Garrison I*, 429 S.C. at 348–49, 838 S.E.2d at 31. This court agreed with the plaintiffs that the inconsistency between the circuit court's JNOV and its previous denial of the defendant's directed verdict motion (when the circuit court found sufficient evidence to support punitive damages) could be explained by the court losing sight of the standard for a JNOV "after being confronted with the enormity of the jury's punitive damages award." *Id.* at 349, 838 S.E.2d at 31. Nothing in the opinion stated or even implied that granting a JNOV after having denied a directed verdict rests on an improper basis. If such were the case, our rules of civil procedure would not contemplate the circuit court's reconsideration of the legal questions raised in the directed verdict motion. But, of course, Rule 50(b), SCRCP, does contemplate such a reconsideration:

> Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury *subject to a later determination of the legal questions raised by the motion*. A party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict[.]

(emphasis added)); *see also Wright v. Craft*, 372 S.C. 1, 20, 640 S.E.2d 486, 496 (Ct. App. 2006) ("[A] motion for JNOV under Rule 50(b), SCRCP[,] is a renewal of a directed verdict motion.").

Based on the foregoing, the circuit court properly granted a JNOV on the civil conspiracy claim.

## II. Collateral Estoppel

Respondents-Appellants assign error to the circuit court's denial of their directed verdict and JNOV motions as to Pampu's defamation claim.[11] They argue that (1) pursuant to the doctrine of collateral estoppel, Pampu is bound by Clemson's findings that Ms. Wingo did not have the capacity to consent and Pampu should have known that and (2) these findings establish that the alleged defamatory statements made by Respondents-Appellants were true and, therefore, defeat Pampu's defamation claim. *See Kunst v. Loree*, 424 S.C. 24, 40, 817 S.E.2d 295, 303 (Ct. App. 2018) ("The truth of the matter is a complete defense to an action based on defamation." (quoting *WeSav Fin. Corp. v. Lingefelt*, 316 S.C. 442, 445, 450 S.E.2d 580, 582 (1994) (per curiam)). We agree.

> To prove defamation, the plaintiff must show (1) a *false* and defamatory statement was made; (2) the unprivileged publication was made to a third party; (3) the publisher was at fault; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*McBride v. Sch. Dist. of Greenville Cnty.*, 389 S.C. 546, 559–60, 698 S.E.2d 845, 852 (Ct. App. 2010) (emphasis added).

In Pampu's complaint, his defamation claim states, in part,

> [Ms. Wingo and Gahagan] made *false* and defamatory statements about [Pampu] to administrators at Clemson University, to the national headquarters of [Pampu's]

---

[11] Pampu questions the existence of a directed verdict motion on the ground of collateral estoppel, but Respondents-Appellants raised collateral estoppel as one of their grounds for a directed verdict at the end of their case. Likewise, they raised this issue in their respective JNOV motions.

fraternity, as well as to fellow students. . . . [Mr. Wingo's][12] statements to the national headquarters of [Pampu's] fraternity were based on confidential and incomplete findings, which only served to breed further acts of defamation and harassment. . . . Similarly, [Ms. Wingo's] statements at the public speaking competition were defamatory and further perpetuated [Respondents-Appellants'] acts of defamation and harassment. . . . [Respondents-Appellants'] statements were made with actual malice. . . . [Respondents-Appellants'] statements during the Title IX proceedings were defamatory and are not protected by "privilege" because [Respondents-Appellants] made those statements knowing they were *false*.

(emphases added).[13]

---

[12] Mr. Wingo is Ms. Wingo's father.

[13] The defamation claim specifically referenced the following statements as defamatory: (1) Ms. Wingo "reported the alleged incident to . . . a counselor at Clemson's Counseling and Psychological Services"; (2) Gahagan "actively participated in spreading the false allegations that [Pampu] had raped [Ms. Wingo]"; (3) Ms. Wingo submitted a Title IX complaint to OCES, pursuing a "false report of sexual misconduct"; (4) Gahagan was discussing the ongoing Title IX investigation "and the incident in question" around campus and "publicly referring to [Pampu] as a 'rapist' around campus," making "these statements to at least ten members of the Clemson community"; (5) Respondent-Appellant David Wingo sent a letter concerning the OCES findings to Pampu's fraternity and attached the February 29, 2016 decision letter from the administrative hearing board's chairperson despite the fact that Pampu's appeal from that decision was still pending and "knowing it concerned a false allegation and finding of sexual misconduct"; (6) Ms. Wingo "continued to disseminate her lies by making a public presentation regarding sexual assault to members of the campus community at a Clemson sponsored event" in which she "falsely stated that she had been sexually assaulted on October 24, 2015" and provided "sufficient detail during her presentation . . . for attendees to identify [Pampu] as the perpetrator"; and (7) Respondents-Appellants "pursued a false claim of sexual misconduct" during the Title IX investigation and proceedings to "numerous administrators in Clemson's OCES."

Pampu has never contested the fact that he and Ms. Wingo had sexual intercourse. Therefore, to determine whether Respondents-Appellants' statements concerning this encounter were false, the trier of fact must focus on whether Ms. Wingo had the capacity to consent. Under both state law and Clemson's Anti-Harassment Policy, the lack of capacity to consent is key to determining the culpability of an individual charged with sexual misconduct. *See* S.C. Code Ann. § 16-3-654(1) (2015) ("A person is guilty of criminal sexual conduct in the third degree if the actor engages in sexual battery with the victim and if . . . [t]he actor knows or has reason to know that the victim is mentally defective, mentally incapacitated, or physically helpless and aggravated force or aggravated coercion was not used to accomplish sexual battery."); S.C. Code Ann. § 16-3-651(f) (2015) (stating, "'Mentally incapacitated' means that a person is rendered temporarily incapable of appraising or controlling his or her conduct whether this condition is produced by illness, defect, the influence of a substance[,] or from some other cause"); *Clemson University Anti-Harassment and Non-discrimination Policy* § II.C.1 (defining "Rape" as "[t]he carnal knowledge of a person without the consent of the victim including instances where the victim is incapable of giving consent because of his/her age or because of his/her temporary or permanent mental or physical incapacitation"); *id.* at § II.D (defining consent to sexual contact or behavior and including "impairment due to the influence of alcohol" as a factor that "may limit or negate a person's ability to consent"); *see also State v. Lindsey*, 355 S.C. 15, 19, 583 S.E.2d 740, 741 (2003) (referencing the common law definition of rape as "the carnal knowledge of a woman by force and against her consent" (quoting *State v. Tuckness*, 257 S.C. 295, 299, 185 S.E.2d 607, 608 (1971))).

Prior to Pampu's filing of the present action, Clemson's administrative hearing board found that Ms. Wingo was incapable of giving consent because of her incapacitation and that Pampu should have known Ms. Wingo did not have the capacity to consent. As we explain below, these findings are binding in the present action and preclude Pampu from asserting the falsity of Respondents-Appellants' references to Pampu's "rape" of Ms. Wingo and to his "sexual misconduct," therefore defeating Pampu's defamation claim. *See Kunst*, 424 S.C. at 40, 817 S.E.2d at 303 ("The truth of the matter is a complete defense to an action based on defamation." (quoting *WeSav Fin. Corp.*, 316 S.C. at 445, 450 S.E.2d at 582). On this basis, Respondents-Appellants are entitled to a JNOV on this claim.

"Collateral estoppel is an equitable doctrine." 46 Am. Jur. 2d Judgments § 469 (2025) (footnote omitted). "It is founded on principles of fundamental fairness, and fairness is its overriding concern." *Id.* (footnotes omitted). In the present case, we conclude that ultimately, fundamental fairness requires the court to

give preclusive effect to the administrative hearing board's February 29, 2016 findings.

> "Collateral estoppel prevents a party from re-litigating an issue in a subsequent suit which was actually and necessarily litigated and determined in a prior action." Our courts have applied the doctrine of issue preclusion to the factual determinations of administrative tribunals. However, not every factual determination by an administrative agency is entitled to preclusive effect.
>
> . . .
>
> In order to determine whether an agency's factual finding is preclusive, we must first determine whether the particular finding meets the traditional elements of collateral estoppel. We must then examine whether there is some countervailing consideration which necessitates relitigation. A party claiming preclusive effect under collateral estoppel must demonstrate that the particular issue was "(1) actually litigated in the prior action; (2) directly determined in the prior action; and (3) necessary to support the prior judgment."

*Crosby v. Prysmian Commc'ns Cables & Sys. USA, LLC*, 397 S.C. 101, 108–09, 723 S.E.2d 813, 816–17 (Ct. App. 2012) (footnote omitted) (citations omitted) (first quoting *Aaron v. Mahl*, 381 S.C. 585, 592, 674 S.E.2d 482, 486 (2009); and then quoting *Carolina Renewal, Inc. v. S.C. Dep't of Transp.*, 385 S.C. 550, 554, 684 S.E.2d 779, 782 (Ct. App. 2009)); *see also* Restatement (Second) of Judgments § 27 (Am. L. Inst. 1982) ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim."). Further, "our courts have applied collateral estoppel only when the party against whom estoppel is asserted had a full and fair opportunity to previously litigate the issue." *Carolina Renewal*, 385 S.C. at 555, 684 S.E.2d at 782.

"Our courts have relied heavily on the Restatement (Second) of Judgments in developing collateral estoppel jurisprudence." *Id.* at 556 n.2, 684 S.E.2d at 783 n.2. In *Beall v. Doe,* this court adopted section 29 of the Restatement (Second) of

Judgments (1982), which addresses the application of issue preclusion in subsequent litigation with different parties.  281 S.C. 363, 370, 315 S.E.2d 186, 190 (Ct. App. 1984).  Section 29 states, in part,

> A party precluded from relitigating an issue with an opposing party, in accordance with §§ 27 and 28, is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue.

Restatement (Second) of Judgments § 29 (1982).  Section 29 is appropriate for application in the present case because Mr. Wingo and Gahagan were not parties to the Title IX proceedings or the federal action against Clemson, and Ms. Wingo was not a party to the federal action against Clemson.

In the present case, the first "action" is the Title IX proceedings that resulted in the administrative hearing board's findings concerning Ms. Wingo's consent.  These proceedings began after OCES received the report regarding the sexual encounter, which prompted Clemson's Deputy Title IX Coordinator, Alesia Smith, to initiate a three-month investigation involving at least thirteen interviews.  After the investigation's conclusion, Smith held a conference with Pampu to advise him of Clemson's allegations that he violated the following student regulations:  Alcohol, Disorderly Conduct, "Harm to Person," and Sexual Misconduct.  Smith also advised Pampu that the recommended sanction was dismissal from Clemson with no eligibility to return.  Pampu requested an administrative hearing, and Smith later sent to him written notice of the date, time, and location of the hearing as well as the names of the witnesses likely to be called by OCES.  The notice also advised Pampu to provide Smith with the names of any additional witnesses who would be attending the hearing on his behalf and stated that the evidence to be presented consisted of the investigator's report, including text messages and witnesses' accounts.

A five-member administrative hearing board conducted a hearing on February 29, 2016, which was recorded and transcribed.  The board members included a faculty representative, a staff representative, and two student representatives.  The board's chairperson, David Frock, opened the hearing with an explanation of the hearing's purpose and the right of either the complainant (Ms. Wingo) or the responding student (Pampu) to appeal the resulting decision. Chairperson Frock also explained that those accompanying Ms. Wingo and Pampu, including legal counsel, would not be allowed to directly participate in the proceedings but could speak to

the students and advise them during the hearing. Both Pampu and Ms. Wingo were assisted by South Carolina licensed attorneys.

Chairperson Frock further advised the students that the alleged violations of the student code of conduct had to be "proven based upon a preponderance of the evidence." The board did not implement any formal rules of evidence, but Chairperson Frock and Smith, who presided as the hearing officer, periodically interjected to exclude repetitious or irrelevant information. OCES presented five fact witnesses and Chairperson Frock called two fact witnesses on Pampu's behalf. Pampu was allowed to question all witnesses by submitting the questions to Frock, who then asked the questions after vetting them.

One of the OCES witnesses, an investigator, summarized the investigation and explained that, having known that Ms. Wingo and Pampu had intercourse, the investigators' focus was on information relevant to Ms. Wingo's capacity to consent. After Pampu questioned the witness, Smith interjected to explain, "incapacitation is the issue at hand." The remaining fact witnesses, which included Pampu and two additional witnesses appearing on his behalf, provided their observations of Ms. Wingo's behavior just before and immediately after the sexual encounter. Subsequently, Ms. Wingo and Pampu were allowed to give oral statements and to question each other after their respective statements were given.

The board then deliberated on whether Pampu had committed any of the policy violations with which he had been charged. The board returned from deliberations to announce its determination that Pampu had committed all charged violations. The board then considered information necessary to determine the appropriate sanction, including the statements of Ms. Wingo's mother, three character witnesses for Pampu, and the campus counselor's description of Ms. Wingo's emotional and psychological state since the night of the party. The counselor stated that Ms. Wingo was suffering from post-traumatic stress disorder and Pampu's continued presence on campus would have an adverse impact on her recovery.

After the board deliberated on the sanction, Chairperson Frock announced that Pampu would be suspended but would be allowed to reapply for admission that following August. Chairperson Frock later sent a letter to Pampu stating the board's findings that Ms. Wingo lacked the capacity to consent to sexual intercourse and that Pampu should have known so. Chairperson Frock advised Pampu that the suspension would begin "immediately or at the conclusion of any appeals that are filed that result in [Pampu] remaining at Clemson University throughout the appeal

process." The letter also stated that if the suspension were to begin immediately, Pampu would be eligible to re-enroll for the 2016 Fall semester. Chairperson Frock also advised Pampu of the steps necessary to appeal the board's decision.

A few days later, Ms. Wingo and Pampu filed cross-appeals with Clemson's Vice President for Student Affairs, Almeda Jacks, but Vice President Jacks upheld the five-month suspension.[14] Both Ms. Wingo and Pampu then appealed to the Office of the President, and Ms. Wingo filed a reply to Pampu's appeal. The President's Chief of Staff issued a decision on May 27, 2016, upholding the board's findings and increasing the suspension period by one year, effective until August 1, 2017. The decision specifically stated that it was final.[15]

On June 15, 2016, Pampu filed a complaint in federal court against Clemson and its employees, asserting claims for violation of Title IX and due process, *inter alia*.[16] In addition to damages, Pampu requested

> a judicial declaration that (i) the outcome and findings made by Clemson be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension from Clemson be removed from his education file; (v) any record of the complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be readmitted to Clemson for the Fall 2016 semester; and (vii) Clemson's rules, regulations and guidelines are unconstitutional as applied[.]

The parties engaged in mediation on March 21, 2018, and reached a settlement agreement that was reduced to handwriting and signed by both Pampu and his counsel. *Doe v. Clemson Univ.*, No. 8:16-CV-1957, 2019 WL 1383822, at *1

---

[14] Ms. Wingo sought Pampu's dismissal from Clemson.

[15] Because Pampu was not dismissed from Clemson, he could have re-enrolled for classes at the conclusion of the suspension period. However, he ultimately transferred to the College of Charleston and graduated with a degree in biochemistry.

[16] In his complaint, Pampu stated that, *inter alia*, both he and Ms. Wingo were intoxicated when they had sex on October 24, 2015, but the defendants "failed to consider the effect of [his] incapacitation on his ability to affirmatively consent to the physical contact initiated by [Ms. Wingo]." He quoted a provision in Clemson's student code of conduct stating, "Intoxication of the respondent is not an excuse for failure to obtain consent or failure to know of the complainant's inability to consent."

(D.S.C. Mar. 27, 2019). The parties executed the formalized version of the agreement on July 1, 2019. The agreement's terms included, *inter alia*, the payment of $100,000 to Pampu's attorneys, keeping in place the board's February 29, 2016 decision "as upheld by the University Vice President of Student Affairs," and Pampu's voluntary dismissal of his action before the District Court with prejudice.

### The Board's Procedures

In evaluating the necessity of relitigating the issue of Ms. Wingo's consent, the apparent failure of OCES to administer an oath to witnesses during the February 29, 2016 hearing gives us pause. *See Crosby*, 397 S.C. at 109, 723 S.E.2d at 817 ("In order to determine whether an agency's factual finding is preclusive, we must first determine whether the particular finding meets the traditional elements of collateral estoppel. We must then examine whether there is some countervailing consideration which necessitates relitigation."). However, our overriding concern is fairness. *See* 46 Am. Jur. 2d Judgments § 469 ("[Collateral estoppel] is founded on principles of fundamental fairness, and fairness is its overriding concern." (footnotes omitted)). In light of this, we view Pampu's course of action (or inaction) after receiving the final decision of Clemson's President as the decisive factor in our conclusion that he was precluded from relitigating the issue of Ms. Wingo's consent.

First, Pampu's assertion that inadequacies in the board's procedures violated due process and made the board's findings unreliable rings hollow in the face of his failure to seek judicial review of Clemson's final decision in state court and his settlement of his federal lawsuit against Clemson that kept the board's February 29, 2016 decision in place. *Cf. Earle v. Aycock*, 276 S.C. 471, 475, 279 S.E.2d 614, 616 (1981) (holding that a former employee of a state agency was barred from relitigating the validity of his discharge in court after the State Grievance Committee upheld the discharge because he did not seek judicial review of the committee's decision). We will address this in more detail below.

Further, it simply could not have been the legislative intent underlying the South Carolina Campus Sexual Assault Information Act to allow a student disciplined in proceedings authorized by the Act to indirectly attack that decision with a retaliatory defamation suit against his accuser. *See Tempel v. S.C. State Election Comm'n*, 400 S.C. 374, 378, 735 S.E.2d 453, 455 (2012) ("Th[e appellate c]ourt will not construe a statute in a way which leads to an absurd result or renders it meaningless."); *id.* ("The statutory language must be construed in light of the intended purpose of the statute."); *Smith v. S.C. Ins. Co.*, 350 S.C. 82, 87, 564 S.E.2d 358, 361 (Ct. App. 2002) ("A statute must receive a practical and reasonable

interpretation consistent with the 'design' of the legislature."). Pampu argues that his defamation claim is based on statements Respondent-Appellants made "outside of the Clemson process." However, the defamation claim set forth in Pampu's complaint specifically referenced statements outside of the proceedings *and within* the Title IX process as being false and defamatory.

Recognizing the "serious nature and consequences of sexual assault and the particular problems caused by sexual assault within a campus community," the General Assembly chose to require colleges to implement a campus sexual assault policy including programs aimed at prevention and awareness and procedures to follow if a sexual assault of a student occurs. S.C. Code Ann. § 59-105-30 (2020); *see* § 59-105-40(A). The policy "must address," *inter alia*, disciplinary procedures, possible sanctions, and notification of services for sexual assault victims. § 59-105-40(B). We are required to read these provisions so that they are not "rendered surplusage, or superfluous,' for '[t]he General Assembly obviously intended [the statute] to have some efficacy, or the legislature would not have enacted it into law.'" *CFRE, LLC v. Greenville Cnty. Assessor*, 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011) (alterations in original) (citation omitted) (quoting *State v. Sweat*, 379 S.C. 367, 377, 382, 665 S.E.2d 645, 651, 654 (Ct. App. 2008)). Were a student disciplined under the procedures authorized by the Act allowed to relitigate the findings resulting from those procedures in state court, it would render the Act's provisions superfluous.

Turning to the federal lawsuit, Pampu has enjoyed the benefits of his settlement with Clemson while also trying to assert in the present litigation the very due process allegations against Clemson that the settlement intended to resolve. Pampu had a full and fair opportunity to seek judicial review in state court or to continue the federal lawsuit and allow the federal court to address any inadequacies in the Title IX proceedings. Yet, he declined to do so. He cannot now attack the credibility of those proceedings for purposes of pursuing redress from Respondents-Appellants. It is fundamentally unfair to require Respondents-Appellants to pay damages to Pampu when he already had an opportunity to mitigate those damages by seeking direct review of the Title IX findings and in fact accepted compensation from Clemson for his damages. Pampu simply cannot have it both ways. *See* 46 Am. Jur. 2d Judgments § 469 ("Collateral estoppel is an equitable doctrine. It is founded on principles of fundamental fairness, and fairness is its overriding concern." (footnotes omitted)).

Pampu argues the settlement agreement "makes absolutely no reference to any factual findings" and merely states that Clemson "will reinstate the hearing board's

decision of February 29, 2016."[17]  We find this argument disingenuous because the hearing board's decision necessarily includes its findings that Ms. Wingo did not have the capacity to consent and Pampu should have known this.  But even if Pampu is correct, his argument fails to recognize that the settlement agreement represents his failure to pursue direct review of the board's findings.

Likewise, Pampu emphasizes the following statement in the settlement agreement's introductory recitals:  "Whereas, [Pampu] denies the allegations of [Ms. Wingo's] formal Title IX complaint to Clemson University, the basis of which the hearing board's decision of February 26, 2016 was made[.]"  However, this does not change our analysis.

> "Whereas clauses" are generally viewed as being merely introductory and since recitals indicate only the background of a contract, that is, the purposes and motives of the parties, they do not ordinarily form any part of the real agreement.  Generally, they do not have the force of contractual stipulations.  However, "whereas clauses" can assist in determining the parties' intent; recitals may have a material influence in construing the contract and determining the intent of the parties, and in such respect they should, so far as possible, be reconciled with the operative clauses and be given effect.
>
> Generally, if the recitals in a contract are clear and the operative part is ambiguous, the recitals govern the construction; however, if the recitals are ambiguous and the operative part is clear, the operative part must prevail. If both the recitals and the operative part are clear, but they are inconsistent with each other, the operative part must control.

17A Am. Jur. 2d *Contracts* § 373 (footnotes omitted).

Here, it is important to place the statement emphasized by Pampu back within the context of the entire settlement agreement.  Considering the agreement as a whole, the recitals and the operative parts are clear and, therefore, the operative parts

---

[17] We question the use of the term "reinstate" because nothing in the record indicates that the board's decision was annulled or vacated.

must control.  The operative language shows the parties' intent to keep in place the hearing board's decision, which necessarily includes its findings on consent.  And by virtue of the federal district court's adoption of the parties' agreement as a basis to dismiss Pampu's lawsuit, any individual's restatement of the board's findings on consent would be truthful as a matter of law.  *See* Restatement (Second) of Judgments § 27 (1982), comment e (stating that a consent judgment may be conclusive with respect to one or more issues if the parties have entered an agreement manifesting such an intention).

We acknowledge that there are occasions when a party should be afforded an opportunity to relitigate an issue previously decided in another proceeding.  Restatement section 29(2) states,

> A party precluded from relitigating an issue with an opposing party, in accordance with §§ 27 and 28, is also precluded from doing so with another person unless the fact that he lacked full and fair opportunity to litigate the issue in the first action or other circumstances justify affording him an opportunity to relitigate the issue.  The circumstances to which considerations should be given include those enumerated in § 28 and also whether:
>
> . . .
>
> (2) The forum in the second action affords the party against whom preclusion is asserted procedural opportunities in the presentation and determination of the issue that were not available in the first action and could likely result in the issue being differently determined[.]

*See also* Restatement (Second) of Judgments § 28(3) (1982) ("A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them[.]").  However, the circumstances in the present case do not justify giving Pampu a second bite at the apple.

First, as we previously stated, this retaliatory action flies in the face of the requirements of, and the policy underlying, the South Carolina Campus Sexual Assault Information Act.  Further, during the disciplinary hearing, Pampu was allowed to present multiple witnesses to multiple finders of fact—a five-member

administrative board that included two student representatives. In addition to providing his own observations of Ms. Wingo's behavior before and after the sexual encounter, he presented two additional witnesses. Pampu was also allowed to cross-examine OCES witnesses just as he was allowed to cross-examine Respondents-Appellants' witnesses in the present action. Moreover, in the OCES hearing, Pampu was accompanied by counsel to advise him throughout that proceeding.

We acknowledge that Pampu's ability to subpoena witnesses for the trial in this case enabled him to present more witnesses than the two who appeared voluntarily at the OCES hearing. However, the quantity of witnesses will not *necessarily* make a difference as jurors may assign weight to the testimony that they determine to be appropriate, accepting or rejecting that of several witnesses or one witness or accepting only part of a witness's testimony. *See Ross v. Paddy*, 340 S.C. 428, 434, 532 S.E.2d 612, 615 (Ct. App. 2000) ("Even where the evidence is uncontradicted, the jury may believe all, some, or none of the testimony[.]"). More importantly, Pampu failed to seek judicial review of Clemson's decision in order to obtain relief for either his inability to subpoena witnesses for the OCES hearing or the apparent failure of OCES to administer an oath to witnesses. In sum, the totality of the circumstances in this particular case do not align with those described by section 29(2) or section 28(3) of the Restatement (Second) of Judgments.

Based on the foregoing, we conclude that Pampu had a full and fair opportunity to seek relief from the board's findings on the issue of Ms. Wingo's consent, but he failed to do so and instead chose to keep in place the decision that was necessarily based on those findings. Fundamental fairness requires that the board's findings be given preclusive effect in Pampu's defamation claim.

State Agency/Contested Case

Pampu concedes that preclusive effect may be given to the findings of an administrative agency but argues that Clemson does not fall within the definition of "agency" in our Administrative Procedures Act (APA) and that Clemson is not an extension of the state. We disagree.

Clemson's student disciplinary proceedings addressing sexual assault allegations, as contemplated by section 59-105-40 and as required by due process, qualifies as a "contested case" as that term is defined in the APA, i.e., "a proceeding . . . in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for hearing[.]" S.C. Code

Ann. § 1-23-310(3) (2005); *see* § 59-105-40(A), (B)(4) (requiring institutions of higher learning to implement a written sexual assault policy addressing procedures for disciplinary action in cases of alleged sexual assault); *Doe v. Univ. of N. Carolina Sys.*, 133 F.4th 305, 317 (4th Cir. 2025) ("[A]s a matter of procedural due process, an accused student must be 'afforded the meaningful hearing to which they [are] entitled.'" (quoting *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 630 (4th Cir. 2002))); *id.* (addressing the appropriate scope of "a meaningful hearing in higher-education disciplinary proceedings" in which "the resolution of a disciplinary charge turns on credibility determinations" and "the potential sanctions are severe").

Further, "agency" is defined in section 1-23-310 as "each state board, commission, department, or officer, other than the legislature, the courts, or the Administrative Law Court, authorized by law to determine contested cases[.]" § 1-23-310(2) (Supp. 2024). Clemson is a "State Institution" pursuant to section 59-107-10 of the South Carolina Code, and section 59-105-40(B)(4) contemplates the student disciplinary proceedings Clemson conducts. It logically follows that Clemson is a state agency as defined in the APA. *Cf. Liu v. Portland State Univ.*, 383 P.3d 294, 301 (Or. Ct. App. 2016) (interpreting the term "agency" in Oregon's Administrative Procedures Act (APA) and holding a university that expelled a student was an "agency" and the expulsion proceeding was a "contested case" as those terms were defined in Oregon's APA and, therefore, the APA conferred jurisdiction for judicial review on Oregon's court of appeals); *id.* at 298 ("[T]he expulsion process at issue here was the type of proceeding that necessitated contested case procedures under the APA."); Or. Rev. Stat. Ann. § 183.310(1) ("'Agency' means any state board, commission, department, or division thereof, or officer authorized by law to make rules or to issue orders, except those in the legislative and judicial branches."); Or. Rev. Stat. Ann. § 183.310(2)(a) ("'Contested case' means a proceeding before an agency: (A) In which the individual legal rights, duties or privileges of specific parties are required by statute or Constitution to be determined only after an agency hearing at which such specific parties are entitled to appear and be heard; (B) Where the agency has discretion to suspend or revoke a right or privilege of a person; (C) For the suspension, revocation or refusal to renew or issue a license where the licensee or applicant for a license demands such hearing; or (D) Where the agency by rule or order provides for hearings substantially of the character required by ORS 183.415, 183.417, 183.425, 183.450, 183.460 and 183.470."); Or. Rev. Stat. Ann. § 183.482(1) ("Jurisdiction for judicial review of contested cases is conferred upon the Court of Appeals.").

Therefore, Pampu's argument that the definition of "agency" in the APA does not include any explicit reference to schools, colleges, or universities does not

control our analysis. Moreover, in at least one case, our supreme court has treated a state-supported university as a state agency for purposes of the APA. *See Ross v. Med. Univ. of S.C.*, 317 S.C. 377, 380, 384, 453 S.E.2d 880, 882, 885 (1994) (*Ross I*) (applying provisions of the APA to judicial review of a decision of a state-controlled university board of trustees upholding a professor's termination); *see also Ross v. Med. Univ. of S.C.*, 328 S.C. 51, 62, 492 S.E.2d 62, 68 (1997) (*Ross II*) ("In *Ross I*, the [supreme c]ourt specifically determined the lower court had discretion under provisions of the APA to order discovery concerning alleged irregularities in the grievance proceedings at [the Medical University of South Carolina (MUSC)] and, during the grievance process, MUSC's General Counsel and Vice–President had violated provisions of the APA prohibiting ex parte communication. In arriving at these conclusions, the [c]ourt necessarily decided the APA was applicable to MUSC's grievance proceedings.").[18]

This is consistent with our courts' treatment of secondary school boards as administrative agencies whose decisions are subject to judicial review under the APA. *See Brown v. James*, 389 S.C. 41, 49–50, 697 S.E.2d 604, 608–09 (Ct. App. 2010) (summarizing previous appellate opinions in cases involving school districts and noting the treatment of local school boards as falling within the definition of "agency" in the APA); *Law v. Richland Cnty. Sch. Dist. No. 1*, 270 S.C. 492, 496, 243 S.E.2d 192, 193 (1978) (applying the substantial evidence rule to judicial review of the decision of a school board). This is also consistent with the treatment that several other jurisdictions give to college student disciplinary proceedings. *See Brewbaker v. State Bd. of Regents*, 843 N.W.2d 466, 470–71, 473–75 (Iowa Ct. App. 2013) (applying Iowa's Administrative Procedure Act to judicial review of a university's suspension of a student for harassing a fellow student and characterizing the suspension proceedings as "agency action" and the university's board of regents as "the agency"); *Daley v. Univ. of Tenn.*, 880 S.W.2d 693, 695–96 (Tenn. Ct. App. 1994) (upholding the chancery court's judicial review of an administrative law judge's findings and conclusions in a contested case concerning charges by a university's honor council against a student and applying Tennessee's Administrative Procedures Act, which has a standard of review very similar to South Carolina's APA); *Ruane v. Shippensburg Univ.*, 871 A.2d 859, 860 n.1 (Pa. Commw. Ct. 2005) (explaining a university that suspended a student for violating the student code of conduct by sexually assaulting another student was a part of Pennsylvania's State

---

[18] *Cf. Riggin v. Bd. of Trs.*, 489 N.E.2d 616, 625 (Ind. Ct. App. 1986) (conducting judicial review of a decision of a university's board of trustees to terminate a professor, characterizing the board as an administrative agency, and applying a standard of review virtually identical to the standard under South Carolina's APA).

System of Higher Education, and therefore, it was a Commonwealth agency over which the Commonwealth Court of Pennsylvania had appellate jurisdiction to review student disciplinary proceedings (citing 42 Pa. Cons. Stat. § 763)); Penny J. Rezet, *Courts-Limiting the Intended Scope of the Commonwealth Court's Original Jurisdiction-Balshy v. Rank*, 59 Temp. L.Q. 629, 635 (1986) (explaining that the commonwealth court's appellate jurisdiction under § 763 covers actions on appeal from "governmental agencies and boards"); *Horner-Neufeld v. Univ. of Alaska Fairbanks*, 389 P.3d 6, 10–12 (Alaska 2017) (characterizing a former student's appeals of her dismissal from a university to the superior court and then to the supreme court as administrative appeals and setting forth a standard of review for "the agency's factual findings" and other determinations comparable to that in South Carolina's APA); *id.* at 14 (citing Alaska Appellate Rule 609(b) for the proposition that the superior court "has the discretion to grant a trial de novo in an appeal from an *administrative agency*" (emphasis added)); *Doe v. Brockport*, 186 N.Y.S.3d 458, 460 (N.Y. App. Div. 2023) (concluding that substantial evidence supported a university's finding that a student violated code of conduct provisions governing sexual contact between students and rejecting the student's additional challenge to the sanctions because it "*was not raised during the administrative process or on the administrative appeal and, thus, it is not properly before [the court]* . . . ." (emphasis added))*; e.g., Ayach v. Regents of Univ. of California*, 321 Cal. Rptr. 3d 428, 434 (Cal. Ct. App. 2024) (reviewing a decision of the Los Angeles Superior Court denying two students' petition for a writ of administrative mandate challenging their expulsions from a university and holding that for the petitioners "to have prevailed in the superior court on their petition, they were required to show that [the university] either '(1) acted without, or in excess of, its jurisdiction; (2) deprived [him] of a fair administrative hearing; or (3) committed a prejudicial abuse of discretion,'" similar to the standard of review in South Carolina's APA (second alteration in original) (quoting *Doe v. Regents of Univ. of California*, 285 Cal. Rptr. 3d 532 (Cal. Ct. App. 2021))); *e.g., Doe v. State Univ. of New York, Binghamton Univ.*, 162 N.Y.S.3d 173, 175 (N.Y. App. Div. 2022) ("Insofar as 'administrative decisions of educational institutions involve the exercise of highly specialized professional judgment' . . . , '[c]ourts have repeatedly addressed student [and faculty member] challenges to [disciplinary action] from institutions of higher learning through the conduit of a CPLR article 78 proceeding'. This is particularly true where, as here, a student challenges disciplinary action taken in response to a finding of sexual misconduct in violation of a university's student code." (alterations in original) (citations omitted) (first quoting *Maas v. Cornell Univ.*, 721 N.E.2d 966 (N.Y. 1999), then quoting *Meisner v. Hamilton, Fulton, Montgomery Bd. of Coop. Educ. Servs.*, 108 N.Y.S.3d 206, 209 (N.Y. App. Div. 2019))); *id.* at 175–76 ("Allegations that a university failed to substantially comply with its internal rules and procedures are the frequent subject

of CPLR article 78 proceedings . . . , as are assertions of bias and partiality in the disciplinary process . . . . Upon a careful examination of the complaint, it is clear that the claims all sound in challenges to the propriety of an educational institution's disciplinary determination as arbitrary and capricious, and, therefore, may be properly addressed through a CPLR article 78 proceeding . . . . That plaintiff sought damages in addition to injunctive relief does not change the analysis, as such a demand is incidental to his success in invalidating the administrative determination . . . ." (citations omitted)); N.Y. C.P.L.R. 7801 (excluding civil actions and criminal matters from the scope of article 78 proceedings); N.Y. C.P.L.R. 7803 (limiting questions that may be raised in an article 78 proceeding to whether "the body or officer" failed to perform a duty or exceeded its jurisdiction, or whether a determination violated a lawful procedure, was affected by an error of law, was arbitrary or an abuse of discretion or was not supported by substantial evidence, similar to the standard in South Carolina's APA); N.Y. C.P.L.R. 7804 (characterizing an article 78 proceeding as a special proceeding and providing for the supreme court's jurisdiction over article 78 proceedings)); *Gagne v. Trs. of Indiana Univ.*, 692 N.E.2d 489, 496 (Ind. Ct. App. 1998) (conducting judicial review of a student's expulsion from a university's law school and stating, "When the trial court reviewed the Law School's application of its Code, its 'sole function' was to determine whether the Law School acted illegally, arbitrarily[,] or capriciously, and the court was bound to accept the evidence most favorable to support the Law School's action").

Additionally, we disagree with Pampu's argument that Clemson is not sufficiently affiliated with the state to qualify as a state agency. Pampu cites *Rice Hope Plantation v. South Carolina Public Service Authority* in support of his argument that Clemson's OCES is not a state agency, quoting language from the opinion stating that Clemson "is not an institution or corporation wholly owned and controlled by the State." 216 S.C. 500, 518, 59 S.E.2d 132, 139 (1950), *overruled on other grounds by McCall by Andrews v. Batson*, 285 S.C. 243, 329 S.E.2d 741 (1985). However, this proposition is dictum as the question before the supreme court was whether *the South Carolina Public Service Authority* was a state agency for purposes of sovereign immunity.

In any event, the partially private nature of Clemson's Board of Trustees does not necessarily disqualify Clemson from state agency status. Particularly persuasive is section 59-107-10 of the South Carolina Code,[19] which includes Clemson in the

---

[19] Title 59 of the South Carolina Code governs education, and Chapter 119 of this title addresses Clemson University. Section 59-119-40 requires the General

definition of "State Institution:" "The several state-supported institutions of higher learning, within the contemplation of this chapter, are declared to be: . . . Clemson University, in Clemson . . . ." This is consistent with the requirement in Pampu's settlement agreement with Clemson that *the South Carolina Insurance Reserve Fund* issue the amount of $100,000 to Pampu's attorneys,[20] to serve as consideration for Pampu's dismissal of his action from federal court and his agreement to keep in place the February 29, 2016 decision of the administrative hearing board.[21]

---

Assembly to elect, in joint assembly, six out of the thirteen members of the Board of Trustees. S.C. Code Ann. § 59-119-40 (2020). The remaining seven members are successors to individuals who were nominated by the will of Thomas G. Clemson. *Id.*

[20] *See* S.C. Code Ann. § 1-11-140(A) (2005) ("The State Fiscal Accountability Authority, through the Insurance Reserve Fund, is authorized to provide insurance for *the State, its departments, agencies, institutions, commissions, boards, and the personnel* employed by the State in its departments, agencies, institutions, commissions, and boards so as *to protect the State* against tort liability and to protect these personnel against tort liability arising in the course of their employment." (emphases added)).

[21] Further, the content of several additional statutes demonstrate that Clemson does not exercise a significant degree of autonomy from the State. *See, e.g.*, S.C. Code Ann. § 59-119-100 (2020) ("The State Treasurer shall securely invest and reinvest the funds in his hands derived from the Clemson bequest in such manner as shall be directed by the Governor, the Comptroller General and the State Treasurer or any two of them. He may collect the interest annually upon all investments made of funds of the Clemson bequest and pay the same over to the treasurer of the board of trustees of Clemson University. He shall, under the direction of the Governor, the Comptroller General and the State Treasurer or any two of them, enforce the collection of the principal and interest due on any investment made of such Clemson bequest."); S.C. Code Ann. § 59-119-140 (2020) ("The board of trustees shall make to the General Assembly an annual report of the university, of all farming operations and tests and experiments and of all receipts and expenditures, with a statement of the condition of the property and funds of such university and of all receipts and expenditures of money appropriated thereto by the State."); S.C. Code Ann. § 59-119-570 (2020) ("The board of trustees [of Clemson University] or its proper administrative officers shall file with the State Treasurer within thirty days from the date of their issuance a complete description of all obligations entered into by the board, with the rates of interest, maturity dates, annual payments and all pertinent data.").

Based on the foregoing, we conclude that the administrative hearing board that conducted disciplinary proceedings against Pampu qualifies as a state agency under the APA.

We also reject Pampu's argument that procedural irregularities baked into the administrative hearing process takes that process out of the definition of a "contested case" because the very purpose of judicial review under the APA is to correct errors in the administrative process and the APA provisions governing judicial review anticipate procedural irregularities. *See* S.C. Code Ann. § 1-23-380(4) (Supp. 2024) ("The review must be conducted by the court and must be confined to the record. *In cases of alleged irregularities in procedure* before the agency, not shown in the record, and established by proof satisfactory to the court, the case may be remanded to the agency for action as the court considers appropriate." (emphasis added)). Pampu could have appealed the May 27, 2016 final decision of Clemson's Office of the President within thirty days in accordance with section 1-23-380. *See* § 1-23-380 ("A party who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review pursuant to this article and Article 1. . . . Except as otherwise provided by law, an appeal is to the court of appeals. . . . Proceedings for review are instituted by serving and filing notice of appeal as provided in the South Carolina Appellate Court Rules within thirty days after the final decision of the agency or, if a rehearing is requested, within thirty days after the decision is rendered.").

However, Pampu chose not to do so, and even if his failure to appeal did not preclude his action against Clemson in federal court, the parties settled the case, and this settlement allowed the February 29, 2016 decision of Clemson's administrative hearing board to remain in place. This was fatal to his defamation claim in the present case. *See Earle*, 276 S.C. at 475, 279 S.E.2d at 616 ("Earle appealed his discharge to the State Grievance Committee which upheld the validity of the discharge. He did not appeal the decision of the committee to the courts. He is precluded from raising the validity of the discharge in a collateral action as the decision of the committee became the law of the case, and the doctrine of res judicata bars the relitigation of this issue.").

<u>Essentiality</u>

Pampu also argues that the board's findings concerning Ms. Wingo's consent were not necessary to support its decision to suspend Pampu.[22] Specifically, he contends that the board's imposition of his suspension for "Sexual Misconduct," as defined in Clemson's Anti-Harassment Policy and which excludes sexual intercourse, means that "incapacitation during sexual intercourse was irrelevant [to] the findings of responsibility" in the board's decision. We disagree.

At the board's hearing, Pampu admitted that he had sexual intercourse with Ms. Wingo on October 24, 2015, and therefore, this was not a disputed issue. As recognized by the OCES hearing officer, the only contested issue before the board was the issue of Ms. Wingo's consent. Accordingly, we need not speculate as to why OCES charged Pampu with "Sexual Misconduct" rather than "Sexual Assault and/or Battery," as those terms are defined in Clemson's Anti-Harassment Policy. Further, the determination of capacity to consent does not depend on the type of sexual offense with which a student is charged.

Section II of Clemson's Anti-Harassment Policy defines several terms, including "Sexual Harassment" and "Consent." Within the definition of sexual harassment are the terms "Sexual Assault and/or Battery," "Sexual Coercion," "Sexual Misconduct," "Dating/Relationship Violence," "Domestic Violence," and "Stalking." The term "Sexual Assault and/or Battery" includes non-consensual sexual intercourse or "any intrusion, however slight, of any part of a person's body or of any other object into the oral, genital or anal openings of another person's body." On the other hand, "Sexual Misconduct" includes "[a]ny other nonconsensual conduct of a sexual nature including but not limited to touching, fondling, kissing, groping," etc. "Consent" is defined as requiring "speech or conduct indicating a freely given, un-coerced agreement to engage in sexual contact." Further, the Anti-Harassment Policy defines "Inability to Consent" as including but not limited to "impairment due to the influence of alcohol or drugs."

The board's February 29, 2016 letter to Pampu referenced "an incident occurring on October 24[], 2015[,] which resulted with [Pampu] being charged with violating Clemson's Student Regulations concerning "Alcohol," "Disorderly Conduct," "Harm to Person," and "Sexual Misconduct." The board then stated:

---

[22] *See Crosby*, 397 S.C. at 109, 723 S.E.2d at 817 ("A party claiming preclusive effect under collateral estoppel must demonstrate that the particular issue was '(1) actually litigated in the prior action; (2) directly determined in the prior action; and (3) necessary to support the prior judgment.'" (quoting *Carolina Renewal*, 385 S.C. at 554, 684 S.E.2d at 782)).

"Based on the information presented[,] the hearing board found that the complainant was incapacitated and unable to give consent which you should have reasonably known, therefore you were found in violation of all four charges[.]"  The letter further stated that "as a result," the board was imposing a suspension from Clemson until August 1, 2016 as well as other sanctions.

These sanctions were undoubtedly based on the finding that Pampu should have known Ms. Wingo did not have the capacity to consent to *any* sexual contact.  Therefore, this finding was essential to the board's imposition of sanctions against Pampu.  The classification that was assigned (or should have been assigned) to Pampu's sexual offense was not essential to the suspension decision because Pampu had already admitted that he and Ms. Wingo had intercourse, and the only contested issue before the board was the issue of consent.  Therefore, Pampu's hyper-technical distinctions between the definitions in the Anti-Harassment Policy have no bearing on the collateral estoppel analysis in the present case.

Finally, Pampu asserts that Clemson's findings should not be employed as a defense against his defamation claim because that claim is based on statements made by Respondents-Appellants "**outside** of the Title IX process."  Yet, the defamation claim set forth in Pampu's complaint specifically referenced statements outside of the proceedings *and within* the Title IX process as being false and defamatory.  More to the point, this is a distinction without a difference as the setting of the publication of the allegedly defamatory statements has no bearing on the defense of truth.  *See McBride*, 389 S.C. at 559–60, 698 S.E.2d at 852 (requiring a defamation plaintiff to show, *inter alia*, the defendant's publication of a false and defamatory statement to a third party).  If Pampu is collaterally estopped from asserting the falsity of statements that are consistent with Clemson's findings on consent, then Pampu does not get to attack those statements in any setting.

In sum, collateral estoppel precludes Pampu from relitigating the issue of Ms. Wingo's consent, and hence, the truth of the alleged defamatory statements of Respondents-Appellants defeats Pampu's defamation claim.  *See Kunst*, 424 S.C. at 40, 817 S.E.2d at 303 ("The truth of the matter is a complete defense to an action based on defamation." (quoting *Lingefelt*, 316 S.C. at 445, 450 S.E.2d at 582).  Therefore, the circuit court erred by denying Respondents-Appellants' JNOV motions.

**CONCLUSION**

Accordingly, we affirm the circuit court's JNOV on the civil conspiracy claim, reverse the circuit court's denial of Respondents-Appellants' motions for a JNOV on the defamation claim, and remand for the entry of a JNOV on this claim.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**WILLIAMS, C.J., and TURNER, J., concur.**